## COLUMBIAN FUEL CORPORATION v. UNITED FUEL GAS CO.

## UNITED CARBON CO. v. SAME.

### Civil Actions Nos. 694 and 695.

District Court, S. D. West Virginia.

July 29, 1947

Hodges & Revercomb, of Charleston, W. Va. (Arthur B. Hodges, of Charleston, W. Va., of counsel), for plaintiff Columbian Fuel Corporation.

Osman E. Swartz, of Charleston, W. Va., for plaintiff United Carbon Co.

B. J. Pettigrew and Campbell, McClintic & James, all of Charleston, W. Va. (Charles C. Wise and Stanley E. Dadisman, both of Charleston, W. Va., of counsel), for defendant.

MOORE, District Judge.

These actions were instituted against the Warfield Natural Gas Company, a corporation. United Fuel Gas Company, which acquired all the assets and assumed all the liabilities of the original defendant pending the action, was, by stipulation of the parties, substituted as defendant.

The two cases were consolidated because they present similar claims against the same defendant based on contracts with the two plaintiffs which are identical in their terms so far as these relate to the present controversy. Plaintiff Columbian Fuel Corporation will hereinafter be referred to as "Columbian." Plaintiff United Carbon Company will hereinafter be referred to as "United." Warfield Natural Gas Company will hereinafter be referred to as "Warfield."

On December 31, 1930, United executed an agreement with Warfield for the sale to Warfield of United's gas produced in ten Counties in eastern Kentucky, and one adjoining County in southwestern West Virginia, namely, the Counties of Pike, Floyd, Knott, Johnson, Martin, Magoffin, Morgan, Breathitt, Wolfe and Letcher in Kentucky, and the County of Mingo in West Virginia. On November 18, 1931, Columbian (under its then name of Piney Oil & Gas Company) executed a like agreement for the sale to Warfield of its gas produced in nine Counties in eastern Kentucky, namely, the Counties of Pike, Floyd, Knott, Perry, Letcher, Breathitt, Morgan, Lawrence and Johnson. The United contract affected an acreage of 83,629 acres, while the acreage included in the Columbian contract was 83,587 acres. Both contracts were for the life of the respective acreage covered. Both contracts fixed the price to be paid per thousand cubic feet of gas up to November 1, 1940, on an ascending scale as follows:

| | |
|---|---|
| Prior to November 1, 1932 | 12 cents |
| November 1, 1932, to November 1, 1935 | 14 cents |
| November 1, 1935, to November 1, 1940 | 15 cents |

Thereafter under the provisions of both gas sales contracts the price of the gas was to be determined once every five years by agreement or arbitration. The Columbian contract fixed a minimum price of 15 cents after November 1, 1940, but the United contract contained no such limitation. Otherwise both contracts contained identical provisions with respect to arbitration, the only terms of which in controversy here being comprised in the following provision:

"The arbitrators shall base their decision upon the then reasonable market value of gas in that territory, delivered at gathering points adjacent to the wells as specified in this agreement and deliverable during the said period of five years."

It was, of course, stipulated in the contracts that the decision of the majority of the arbitrators should be final. A supplemental contract between Columbian and Warfield, dated November 15, 1934, modified the schedule of prices to be paid prior to November 1, 1940, as follows:

| | |
|---|---|
| November 1, 1934, to November 1, 1935 | 11 cents |
| November 1, 1935, to November 1, 1939 | 12 cents |
| November 1, 1939, to November 1, 1940 | 15 cents |

For the five year period from November 1, 1940, to November 1, 1945, the price was fixed by agreement of the parties at 15 cents per thousand cubic feet. The parties were unable to agree upon a price for the five year period beginning November 1, 1945, and consequently arbitrators were appointed to fix the price for that five year period. The submission agreements named the arbitrators and included the following language as Paragraphs 5 and 8 respectively:

"5. It shall be the duty of said arbitrators to determine the price which shall be paid by the party of the second part to the party of the first part for natural gas sold and delivered by the party of the first part to the party of the second part under the terms and provisions of said agreement dated December 31, 1930, (as to Columbian, November 18, 1931, as modified and supplemented by said agreement dated November 15, 1934) for the period of five years beginning November 1, 1945. * * *

"8. The arbitrators shall not be bound by the strict rules of evidence, and may give such weight to the evidence as may seem right and proper to them."

Stipulations were entered into at the time of the submissions to the effect that each party might submit any documents, information, data, testimony and any other matter which it might desire to present.

The arbitrators, having conducted hearings and having received voluminous testimony and exhibits, which are now a part of the record in this action, made their awards on October 24, 1946. In both instances the award was that Warfield should pay to United and to Columbian for all gas delivered by them respectively during the five year period beginning November 1, 1945, the sum of 20 cents per thousand cubic feet. The arbitrators were not unanimous in their conclusion. Wallace B. Gribble and Frank E. Eckert agreed to the award as made, whereas J. R. Wylie, Jr., the third arbitrator, dissented and stated in a dissenting opinion, "I am thoroughly convinced that the price of gas under these contracts should not be more than 15 cents per M.C.F."

Warfield refused to recognize the validity of the awards and declined to pay the increased price for the gas. This action on the part of Warfield led to the institution of these suits.

Warfield then moved to dismiss these actions, but this motion was overruled by the Court. See Opinion, D.C., 72 F.Supp. 839.

The dissenting opinion of arbitrator Wylie was offered by the defendant in this proceeding as a part of the record to be considered by the Court. Plaintiffs objected to its being so considered and the Court reserved its decision thereon. It is now determined that this dissenting opinion and the attached exhibits will be considered as part of the record, and the order to be entered pursuant to this opinion may so provide.

The question to be decided by the Court is very simple. It is this: Did the arbitrators exceed their powers under the sub-

mission agreements? Or, to state the question in more detailed form: Since the contracts provided that in case of arbitration the arbitrators should base their decision upon the then reasonable market value of gas in that territory delivered at gathering points adjacent to the wells as specified in the agreements and deliverable during the five year period, did the arbitrators act contrary to the contract limitation in that they based their decision upon the market value of gas in some other territory than the territory meant to be covered by the language of the contracts?

The contentions of the opposing parties on this point may be briefly stated as follows:

Warfield insists that the arbitration was a limited one; that the arbitrators were bound to proceed according to the provisions of the gas sales contracts, and that they were given no power to interpret the contract provisions, but that such interpretation is for the Court; that the words "that territory" are to be interpreted strictly as meaning the area of land embraced within the Counties named in the respective contracts; that market value in that territory as so defined can be ascertained only by evidence of prices being paid for gas within that area; that no appreciable evidence before the arbitrators showed that within that area any gas was sold at a higher price than 15 cents per thousand cubic feet; that they necessarily based their decision on evidence of outside sales; and that therefore the arbitrators exceeded their powers, acted beyond their jurisdiction, and their award should be set aside and held to be of no validity or effect.

United and Columbian contend that the submission agreements provided for an arbitration which, while restricted as to subject matter, was general and unlimited with reference to the particular subject matter submitted; that the contracts themselves were an essential part of the subject matter; that therefore the arbitrators had the power to construe any ambiguous provisions of the contract relating to the arbitration; that the arbitrators' decision as to the meaning of the words "that territory" appearing in the contracts was within their power to make and cannot be reviewed by the Court; that the market value of gas in "that territory," giving to those words the strictest possible interpretation, is not necessarily determined by prices paid and received within the particular area, but that the arbitrators had the right also to consider the price of gas in nearby gas fields; that under the circumstances developed by the evidence which was before the arbitrators, the arbitrators were justified in using as their basis for determination prices paid in other fields as adjusted to conditions prevailing with reference to the particular area covered by the contracts in question and the various provisions of those contracts; and that therefore the arbitrators did not exceed their powers or their jurisdiction, and that the award should be sustained as made.

Warfield relies heavily upon what it refers to as a "compromise" of its contract rights by the arbitrators. It appears from the record of the proceedings of the arbitrators at their first meeting that the question immediately arose as to what evidence might be considered by the arbitrators in arriving at the market value of gas in "that territory," and consequently the price to be fixed for the ensuing five year period. Counsel for the parties engaged in extended argument before the arbitrators on that point. From a consideration of the record made at that meeting it does not appear that counsel for either United or Columbian ever took the position or advanced the argument that the market value, when ascertained, should be other than the market value within the particular area covered by the contracts. They did argue that the arbitrators had the right to construe the language of the contracts, but they conceded that the market value must be fixed as of the place where the gas was to be delivered. Nor did the arbitrators indicate by any statement in the record that they or any of them believed that they were authorized to fix a market value as of any other place. Mr. Wylie, the arbitrator who afterwards dissented from the award, made the following inquiry: "I would like to know the answer to one question from one of you lawyers. If the arbitrators are

required to base their decision upon the reasonable market value in this one territory, are the arbitrators permitted legally to take evidence, outside evidence, on market prices for gas on which they are not allowed to base their decision? * * * I gathered from what Mr. Swartz (attorney for United) said—maybe I was mistaken— they intended to present certain evidence outside of this area, and we wouldn't have to consider that in basing our decision, because it says right in here that we must base our decision upon certain points and he agrees that that's right." After some further argument in which counsel maintained their conflicting views on the question of the propriety of receiving evidence of prices paid outside the particular area covered by the contracts, Mr. Eckert, another of the arbitrators, made a statement in part as follows: "The only thing we are here for is to determine the price in that territory, but the arbitrators have quite a scope and various methods of determining the price of gas in this exact territory. * * * This doesn't say that you shall use a certain contract price. It says that you shall base or set the price of gas in that territory—Now, as to how it shall be done, that is up to the arbitrators, to use the different methods they may know and agree upon, to determine the value of gas at that point, which would make Mr. Pettigrew (counsel for Warfield) right and also Mr. Swartz. * * * We are to determine the price at this particular place. We all know the price we are talking about, but it doesn't go on to say that this price shall be based upon any particular contracts. * * * It doesn't say how the arbitrators would arrive at this price near the wells in eastern Kentucky. I think everything you (referring to Pettigrew) say is true, that we are to determine the price. That is the reason we are here, but as to how we do that—You mean, you only name certain contracts, and that determines it?"

After further argument Mr. Gribble, chairman of the arbitrators, stated, "We appreciate the arguments of counsel on this question, and I presume that the Board next should get together and determine whether it can lay down a prescribed rule within a reasonable limit as to the evidence to be presented and considered by the Board in arriving at the market value of the gas within the scope of this contract."

The arbitrators then held a closed meeting, after which counsel were again called before them, and Chairman Gribble announced in the following words the arbitrators' decision on the question which had been the subject of argument:

"Gentlemen, the Board has had a session and had some difficulty in arriving at the interpretation of the word 'territory' written into the contract. Mr. Wylie had one version of it, Mr. Eckert had another one to the contrary, and this is in effect a compromise between the two views of two members of the Board. We arrived at this: The territory shall include all of the Counties named in the two contracts and the abutting Counties thereto."

From the foregoing it appears clear to the Court that the question before the arbitrators was a question of what evidence might be considered by them and not a question of interpreting the provisions of the contract so as to expand the meaning of the phrase "that territory" insofar as it related to the market value of gas. Chairman Gribble's statement of the arbitrators' decision on the question, when read in the light of the discussion which preceded it, means merely that the arbitrators, by compromise of views as among themselves, agreed to receive and consider evidence of sales of gas not only within the particular area covered by the contracts, but also evidence of sales made in Counties abutting thereon. "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 1918, 245 U.S. 418, 38 S.Ct. 158, 159, 62 L.Ed. 372, L.R.A. 1918D, 254. In view of the provisions of the submission agreements that the arbitrators should not be bound by the strict rules of evidence, and might give such weight to the evidence as might seem right and proper to them, together with the stipulation that any information, data, testimony, or other matters which any party decided to present might be submitted to the arbi-

trators, I am of opinion that the arbitrators clearly had the right to make the decision with reference to the reception of evidence as announced by the chairman.

Moreover, there are reasons for holding that reception by the arbitrators of evidence of outside sales would have been proper, even though they had been bound to follow strict rules of evidence. As I have indicated, their inquiry did not have for its purpose the determination of market *price* within the area covered by the contracts, but market *value*. The market value might be ascertained by evidence of market price, or by other relevant evidence, such as sales in nearby territory, or both. The two phrases, "market value" and "market price" are not necessarily synonymous. "It is usually said that market value is what a *willing* buyer would pay in cash to a *willing* seller." (Emphasis supplied.) United States v. Miller et al., 1942, 317 U.S. 369, 63 S.Ct. 276, 280, 87 L.Ed. 336, 147 A.L.R. 55; see also Vol. 26 Words and Phrases, Perm.Ed., page 552 et seq., Market Value. The only evidence of sales of gas within the particular area covered by the contracts, other than evidence of one contract at a price of 18 cents, which was in effect for a short while and then cancelled in 1945, was that submitted by Warfield, consisting of numerous instances of sales of comparatively small amounts of gas, most of which were made under contracts for the life of the wells, entered into long prior to November 1, 1945. None of these sales was for a price higher than 15 cents per thousand cubic feet. There was also evidence before the arbitrators to the effect that these sales were not truly competitive sales, because of conditions which existed which virtually gave to the buyer the power to fix its own price. It can scarcely be doubted that the provision for an arbitration of prices, out of which this controversy arose, was inserted in the contracts to guard against exactly this situation. A seller of gas would gain no advantage from such a provision if the price to be fixed by arbitration were to be determined solely by sales of gas in a market where the price is "pegged" by the purchaser so that it cannot exceed a certain fixed limit. If no free competitive market existed for gas in the particular area covered by these contracts, evidence of sales in nearby outlying fields not only would be admissible, but would become the only available standard by which the arbitrators could measure true market value. Of course, such evidence should be evaluated and tested comparatively, and differing conditions should be adjusted so as to produce a figure which would represent the fair market value at the place of delivery under the two contracts; but this was a calculation to be made by the arbitrators and not by the Court in this proceeding.

From what I have said, it follows that Warfield is deprived of substantial basis for any of its contentions. On the fundamental question at issue, the plaintiffs' position is correct, and must be sustained.

Having determined that the decision must be for the plaintiffs in accordance with the foregoing reasons, it is unnecessary for the Court to pass upon the question which has been the subject of most of the argument in the able briefs submitted by counsel on both sides, namely, what is the proper interpretation of the phrase "that territory," as used in the contracts. The decision of the arbitrators expressly shows that they fixed the price on the basis of the market value of gas in the particular area covered by the contracts. There is nothing in the record which indicates that they had anything else in mind. The record clearly shows that in fixing the market value in that particular area, they considered evidence of sales in nearby outside areas, which I hold they had the power to do while following strictly the provisions of the contract.

I therefore hold that the arbitrators did not exceed their powers nor go outside their jurisdiction in conducting these arbitrations and making these awards. Consequently, the awards will be sustained, and a proper judgment may be entered to that effect.